OPINION
Terron Hairston was indicted on April 9, 1999, charged with two counts of aggravated murder with death penalty specifications and one count of aggravated robbery with a firearm specification. He was accused of killing Jason McBride while robbing him on October 3, 1998.
Mr. Hairston entered a plea of not guilty at arraignment and two attorneys were appointed to represent him.
Extensive pre-trial discovery was provided. The case proceeded to a jury trial the first time in May of 2000, but a mistrial was declared after the father of Jason McBride started a major disturbance in the courtroom.
A second trial commenced in the fall of 2000. The jury found that Mr. Hairston was guilty of aggravated robbery with the gun specification but was unable to agree upon a verdict as to the two counts of aggravated murder. A third trial began approximately one year later.[1]
After the evidence was presented in the third trial, the jury found Mr. Hairston not guilty of aggravated murder, but guilty of the lesser-included offense of murder. The judge sentenced him to consecutive prison terms of ten years on the aggravated robbery conviction and 15 years to life on the murder conviction. In addition, Mr. Hairston was sentenced to a term of three years on the gun specification.
Terron Hairston has now pursued a direct appeal of his murder conviction, assigning three errors for our consideration:
"Assignment of Error One
"DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.
"Assignment of Error Two
"DEFENDANT-APPELLANT'S CONVICTION WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
"Assignment of Error Three
"THE DEFENDANT-APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS IS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."
Since the second assignment of error requires a detailed review of the evidence presented at trial, we will address that assignment of error first. We then will address the question of whether the verdict of the jury was affected by any alleged misconduct by the prosecution or by any alleged deficiencies in the performance of defense counsel.
Preliminarily, we set forth the standard by which we are bound in reviewing the second assignment of error, which asserts that appellant's murder conviction was against the manifest weight of the evidence.
In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court of Ohio reiterated the well-established standard of review for manifest weight claims:
"* * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's * * * (Law Dictionary (6 Ed. 1990) 1433) * * * at 1594.
"When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs * * * [v. Florida], 457 U.S. at 42 * * *. See, also, State v. Martin (1983),20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
Accordingly, pursuant to the foregoing standard, we examine the record to determine whether the jury "clearly lost its way" in convicting Terron Hairston such that a manifest miscarriage of justice occurred.
In satisfying its evidentiary burden, the prosecution was required to prove the elements of murder, which are set forth in R.C. 2903.02. In relevant part, R.C. 2903.02(A) defines murder as "purposely caus[ing] the death of another."
We turn now to the evidence presented at trial to ascertain whether appellant's murder conviction was against the manifest weight of the evidence.
The first witness to testify was Catherine B. Meadows, who lived near the park where the body of Jason McBride was found. Late in the evening before the body was found, she heard two gunshots.
The second witness to testify was Ulysses Bunch, who also lived in the neighborhood near where the body was found. Mr. Bunch also heard shots, which he thought sounded as if they came from a .38 or .45 caliber gun.
Mark J. Hardy, a criminalist with the Columbus Division of Police, was called out of the normal order of trial, so he was allowed to testify before some exhibits were properly identified. Mr. Hardy was provided a projectile recovered from the body of Jason McBride and compared that projectile with projectiles fired from firearms. Mr. Hardy never matched the projectile from Jason McBride's body with any other projectiles and therefore testified that he had not been provided for analysis the firearm which was used to shoot Jason McBride. Mr. Hardy testified that the projectile from Jason McBride's body had been fired from a .38 caliber revolver or a 9mm firearm.
Steven Redding, an officer with the Columbus Division of Police, was the fourth witness to testify. Officer Redding was dispatched to Amvets Park on Sunday, October 4, 1998, because the body of Jason McBride had been discovered in the southeast corner of the park. Officer Redding testified that the body's genitals were exposed because Jason McBride's pants were down around his knees.
Betty McBride, the mother of Jason McBride, testified next. She and Jason's father were informed of Jason's death during the evening hours of October 4, 1998. They went to the Franklin County Morgue to identify the body and went to Amvets Park to see where their son's body was found.
Jason's mother and father tried to find out who had killed their son by distributing posters and by offering a reward for information about the death. In mid-November, they received a telephone call from a woman who identified herself as "Mary." "Mary" claimed to have information about who had killed Jason. "Mary" offered to meet with the McBrides at a carryout on the northeast side of Columbus. "Mary" did not appear for the meeting. Later, police detectives made contact with "Mary" and arranged for Jason's parents to pay her $1,000.
William Reeves, a firefighter and emergency medical technician with the city of Columbus, was the state's next witness. Mr. Reeves was dispatched at approximately 3:00 p.m. on October 4 to Amvets Park on a call regarding an unconscious person. He found the body of Jason McBride. Rigor mortis had begun to set in.
Homicide Detective Sandra Ladley testified next. She was dispatched to Amvets Park on October 4. She saw the body of Jason McBride. Lying on the ground nearby were a sweatshirt, a hat, a pack of cigarettes and Jason's Ohio State University ID. Two gunshot wounds were visible on the body. Detective Ladley testified at length about the details of the crime scene.
The next evidence presented to the jury was the testimony of Denzil Thompson, which had been recorded by a court stenographer at the second trial. Denzil Thompson had been killed between the second and third trials, so his prior testimony was presented as the testimony of an "unavailable" witness.
Denzil Thompson was 16-years-old on the day Jason McBride was killed. Denzil was 18 when he testified in the second trial. He was living with his mother, Mary, and three siblings near The Ohio State University campus when he testified. Denzil had a juvenile record for theft and receiving stolen property.
In October 1998, Denzil was acquainted with Erica Richards. Denzil, his brother, and friends used to hang out at Erica's apartment almost every day. One of the people Denzil knew from Erica's apartment was Terron Hairston. Another person Denzil knew was Jason McBride, or "J-Rock," as he was better known.
On the evening of October 3, 1998, several people, including Mr. Hairston, were at Erica's apartment. Jason McBride was there, left briefly to go across the street to Kelly's Market, and then returned.
Denzil testified that Terron Hairston asked him if he wanted to go for a ride with him and J. Rock. Denzil agreed to go. They got into a little gray car parked behind Erica's apartment. Supposedly, the three young men were going to get cocaine for J-Rock.
According to Denzil Thompson, Terron drove the three to the area near Amvets Park. They then got out of the car and walked into the park. Terron then pulled a gun and demanded money from J-Rock. J-Rock gave Terron a large sum of money and threw the rest of the things which had been in his pockets on the ground. Denzil claimed that he had not known that this was going to happen.
Terron Hairston ordered J-Rock to pull J-Rock's pants down and to take off his sweatshirt. Supposedly, the purpose of the disrobing was to see if J-Rock had any drugs concealed on him.
Denzil claimed that Terron told J-Rock to run. J-Rock ran and Terron shot him in the back. J-Rock then fell.
Denzil claimed that he (Denzil) ran back toward the car, glancing back only to see Terron Hairston run up to J-Rock and shoot J-Rock in the head. Denzil testified that he ran all the way to the car, but could not get in until Terron returned to unlock the passenger door.
Terron drove the car to his father's house, which was located nearby. Terron and Denzil then entered the house together. Inside the house, Denzil saw a young woman, a male cousin of Terron's, and another man. Terron asked his cousin to "put up the gun." Terron and Denzil then drove back to Erica's apartment.
Denzil described the gun as a black revolver with a wooden handle. Denzil claimed that Terron offered him some money, but Denzil did not take any.
Denzil later told his mother, Mary, what had happened at the park.
Some months later, Denzil was questioned by William Gillette, the lead homicide detective investigating Jason McBride's death. At first, Denzil did not tell Detective Gillette what had happened. Later, he said what he testified to in court.
On cross-examination, Denzil stated that his fingerprints were on the gun used to kill Jason McBride because Denzil had handled the gun when Terron Hairston had shown him the gun earlier in the day.
Denzil acknowledged that he had told his version of the facts on several occasions. He admitted that, by October of 1998, he had dropped out of school, having made it to the ninth grade. Otherwise, the cross-examination involved a detailed review of testimony which did not address the question of who shot Jason McBride.
The next witness to testify was Donta Cook, who was called as the court's own witness so both the prosecution and the defense could cross-examine him. Donta is a cousin of Terron Hairston. Donta was living near Amvets Park with his grandfather in October of 1998. Ricky Cook, Terron's father, lived at the same location when he was not in jail. Donta denied that Terron or anyone else had come to visit after 9:00 p.m. on October 3, 1998.
The state called Rico Darks to testify next. Rico is also a cousin of Terron Hairston. Rico saw Terron with a car about one week after Jason McBride was killed. According to Rico, Terron said he got the money for the car by robbing a man who was looking for cocaine. Terron supposedly said he took the man's money and shot him.
Rico testified that, in return for his testimony, the prosecutor had promised to have his case taken care of for him and the prosecutor helped get him out of jail on bond.
On cross-examination, Rico testified that Terron said that he got $3,000 in the robbery. Cross-examination was discontinued so defense counsel could review material provided under Crim.R. 16 before completing the examination of Rico. The Crim.R. 16 material included a summary of a prior statement by Rico and a tape recording.
Rico Darks acknowledged that another charge which could be filed against him was not going to be filed as a result of his being a witness. Rico continued to testify about a conversation with Terron Hairston regarding the robbery. Terron allegedly said that he parked near his grandmother's house on a street near Amvets Park and walked from there to the park. Terron claimed to have shot his robbery victim in the back, searched his pockets, pulled down his pants and then shot him again. Rico got the impression that only Terron and the victim were present.
The state's next witness was Iesha Hairston, the girlfriend of Donta Cook. Iesha testified that she was reluctant to be a witness — to the extent that a bench warrant had been issued to get her to testify at the second trial.
Iesha testified that, on a night in October of 1998, she was over visiting Donta near Amvets Park when Terron Hairston arrived in the company of a 16 or 17-year-old boy. Iesha testified that she had never known Terron to have a job.
Erica Richards, the next witness, has two children by Terron's older brother, Terrance Collins. She had lived with Terrance until approximately one week after their second child was born. They broke up because Terrance was seeing other women. Terron moved in with Erica after she broke up with Terrance.
On October 3, 1998, J-Rock and a woman knocked on the door of an apartment next to Erica's. Erica thought they were knocking on her door and ended up talking to them. J-Rock asked if she knew where he could get a large amount of crack cocaine. J-Rock flashed a large amount of money. Erica warned him it was dangerous to flash that much cash in that neighborhood.
Soon, Terron Hairston pulled up and Erica introduced him to J-Rock. Erica believed that Terron could help J-Rock find the quantity of drugs he was seeking. About 15 minutes later, Terron and J-Rock left the apartment together. Denzil was with them.
Later, Terron and Denzil returned, but J-Rock was no longer with them. Terron went up to a bedroom where he kept his things, including as many as four guns. One gun Terron owned was a dark steel revolver with a wooden handle. Terron frequently had lots of money, according to Erica.
At trial before she testified, Erica had an encounter with Terron Hairston's father, who called Erica a "sntichin' bitch." Erica responded with a remark and an invitation to kiss his rear end (to paraphrase).
During her testimony, Erica acknowledged that she had been held in custody for over ten months to assure she would be available to testify. While in custody, she claimed to have received a letter from Terron which she tore up because it upset her. The letter said that she was shooting Terron in the head by testifying against him.
Erica also testified that Terron had a heated disagreement with his cousin Tywan. She testified that Tywan told Terron, "`That's fucked up. You were in my mom's car.'" Tywan's mother had a small gray car which matched the description of the car Denzil had described as being used to take Jason McBride to the location where he was killed.
On cross-examination, Erica testified that Terron never claimed to have shot or robbed Jason McBride. She also testified that at least some of the money Terron had came from gambling. She described Denzil's mother as being a crack cocaine user and Denzil as being armed at times. She testified that Detective Gillette threatened her with ten years in jail if she did not cooperate.
On re-direct examination, Erica testified that she, Terron, Terrance, and others ran a crack house next to Erica's apartment. They kept "big guns," meaning automatic weapons, and pit bulls to protect the apartment next door.
Erica also described an encounter she had with Detective Gillette at North Adult Education Center. Erica did not appreciate a detective and two uniformed police officers showing up at her school and threatening her with jail time if she did not cooperate.
After Erica testified, the parties stipulated to chain-of-evidence testimony related to several exhibits.
Tateka Sykes Collins, a sister-in-law of Terron Hairston's, testified that she was incarcerated on drug charges at the Ohio Reformatory for Women when Detective Gillette and an assistant prosecuting attorney came to see her and to interview her about the McBride homicide. She was dating Terrance at the time and was with him when they encountered Terron the day Jason McBride's body was found. The brothers had a conversation about the homicide, but Terron kept claiming he was not involved. Terrance told his brother that he (Terron) needed to dispose of the clothing and the gun.
In later conversations, Terron said Jason McBride was "a dope boy." Terron also said that Denzil looked like the person who had killed Jason McBride. However, according to Tateka, Terron also stated that if Denzil had been cooperating with police, he (Terron) would have "killed him — he supposedly had killed the other boy." Later in her testimony, Tateka indicated that Terron had claimed to have gotten $3,200 in the robbery and that he had broken up and disposed of the gun.
The next witness for the state was Larry Tate, M.D. Dr. Tate performed the autopsy on Jason McBride's body. Mr. McBride died as the result of a gunshot wound to the head. A toxicology report showed a small amount of alcohol and marijuana in Jason McBride's body.
The final witness for the state was William Gillette, the supervising homicide detective on the case. Detective Gillette described various aspects of his investigation, starting with a telephone call advising him of the body being found in Amvets Park. Part of the investigation was an interview with Terron Hairston, during which Terron denied any knowledge of the homicide and of Jason McBride or J-Rock.
The defense called two witnesses to the witness stand, Rashaad A. Davis and Terron Hairston.
Rashaad Davis testified that Denzil Thompson tried to rob him on November 21, 2000. Denzil approached Rashaad and put a gun to his chest. Denzil took Rashaad to an alley and put a gun to the back of Rashaad's head. Denzil took one gun from Rashaad, but Rashaad shot him with a second gun he had. Denzil died from the gunshot wound.
Rashaad acknowledged knowing Terron Hairston, but denied that Terron had anything to do with the shooting of Denzil.
Terron Hairston testified in his own defense. He described his personal history in some detail, including former employment at grocery stores, restaurants and a nursing home. However, he was supporting himself in October of 1998 by selling drugs, especially out of an apartment next to Erica's.
Mr. Hairston testified that he has no memory of what happened on the day Jason McBride was killed. However, he denied involvement in the robbery and homicide. He also denied making the various statements attributed to him by the various prosecution witnesses.
At the conclusion of the testimony, numerous exhibits were admitted and the parties rested. The exhibits included a large number of photographs of the homicide scene.
Returning now to the issues presented on appeal, the issue first presented by the second assignment of error is whether the conviction for murder was against the manifest weight of the evidence.
Applying the standards set forth above, we cannot say that the conviction was against the manifest weight of the evidence. Several witnesses testified about admissions Mr. Hairston made which indicated that he killed Jason McBride. Denzil Thompson's testimony also identified Mr. Hairston as the killer. Mr. Hairston's own testimony was a combination of a claimed lack of memory and a denial of involvement, which the jury could reasonably disbelieve.
Any purported "inconsistencies" in the evidence, including that presented by Mr. Hairston's own testimony, are ultimately credibility determinations; such credibility determinations are properly within the purview of the trier of fact for resolution. The jury acted well within its province in believing the testimony of some witnesses and rejecting all or part of others.
Based upon our careful review of the record, and the applicable standards set forth above in Thompkins, we cannot say that this jury "clearly lost its way" such that a "manifest miscarriage of justice" occurred.
The second assignment of error is overruled.
The first assignment of error alleges that Mr. Hairston was denied a fair trial based upon alleged prosecutorial misconduct.
Given the strength of the state's evidence, we cannot say that the outcome was in any way affected by the prosecutorial misconduct. One of the assistant prosecutors kept attempting to elicit statements from hostile witnesses which could help prove Mr. Hairston's guilt. The assistant prosecutor relied upon police summaries which indicated that the statements had been made to detectives before, but the witnesses refused to repeat the statements. We cannot say that the assistant prosecutor was guilty of prosecutorial misconduct under the circumstances.
The prosecution did elicit testimony which was either inadmissible hearsay or insufficiently supported by a foundation of personal knowledge. This testimony included the alleged disagreement between Mr. Hairston and Tywan about use of Tywan's mother's car, Donta's supposed reaction to seeing the body, and Denzil's alleged willingness to take a polygraph test. While in another case these lapses could be prejudicial, the testimony did not affect the outcome of the trial.
An assistant prosecutor also stepped over the line in his argument about the shooting death of Denzil Thompson. No evidence supported a theory that Mr. Hairston was in any way responsible for Denzil's death. To the extent that the assistant prosecutor implied some responsibility, the assistant prosecutor engaged in misconduct. However, Rashaad's testimony was so clear that Terron Hairston was not involved that the inappropriate argument cannot have affected the verdict.
We also note that the trial judge rebuked the prosecution for its handling of the evidentiary problems and expressed his opinion clearly in front of the jury. This response by the trial judge further reduced the possibility that the jury was influenced by these evidentiary problems.
The first assignment of error is overruled.
By his third and final assignment of error, Mr. Hairston contends that he was denied a fair trial based upon ineffective assistance of counsel.
In Strickland v. Washington (1984), 466 U.S. 668, the United States Supreme Court established a two-prong test in addressing a claim of ineffective assistance of counsel. Initially, a defendant must show that counsel's performance was deficient. Next, the defendant must demonstrate that such deficient performance resulted in prejudice.
After carefully reviewing the record before us, we cannot say that Mr. Hairston's counsel rendered ineffective assistance. No doubt existed that Jason McBride was robbed and murdered. The only question to be resolved was the identity of the murderer. The state of Ohio mustered a great deal of evidence to show that Mr. Hairston was the guilty party. Counsel made a good professional effort to rebut this evidence or to weaken its impact, but was not successful in raising a reasonable doubt about Mr. Hairston's guilt.
Mr. Hairston's own testimony was harmful to him. He had to admit to a laundry list of illegal conduct in order to express his doubts about his involvement in a killing he claimed not to remember. Defense counsel encouraged Mr. Hairston not to testify, but Mr. Hairston wished to testify regardless of his attorney's advice.
Based upon the record before us, we cannot find the requisite "deficient performance" as contemplated by Strickland. Since no such deficiency has been demonstrated, we necessarily do not reach the second prong of the test which speaks to resulting prejudice.
The third assignment of error is overruled.
All three assignments of error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
PETREE and KLATT, JJ., concur.
[1] We note that the aggravated robbery conviction has already been appealed and that conviction affirmed by this court in State v. Hairston (Sept. 21, 2001), Franklin App. No. 01AP-252.